NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0197n.06

Case No. 22-3554

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED

Apr 26, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TYRONE REMBERT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| SWAGELOK COMPANY, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before: GIBBONS, THAPAR, and BUSH, Circuit Judges.

THAPAR, Circuit Judge. Alleging race discrimination, retaliation, and a hostile work environment, Tyrone Rembert sued Swagelok Company under Title VII, 42 U.S.C. § 1981, and Ohio law. The district court granted summary judgment to Swagelok. While we agree that Swagelok is entitled to summary judgment on the race-discrimination and retaliation claims, Rembert has presented a genuine issue of material fact on his hostile-work-environment claim. Thus, we affirm in part, reverse in part, and remand for further proceedings.

I.

Rembert, a black man, started as a temporary employee at Swagelok's Hardware Production Facility in January 2017. He worked as a tool crib operator.

In the nine months that he worked for Swagelok, multiple employees subjected Rembert to race-based harassment daily. Rembert testified that numerous coworkers used the N-word

routinely while he was around. His two white supervisors also used the N-word in comments directed towards him 45–50 times, "if not more," during his time at Swagelok. R. 49-1, Pg. ID 615, 622.

Rembert recounted other instances of racial harassment as well. On one occasion, a coworker made a noose out of a hose pipe, held it up to his face, and told Rembert, "This is what we do around here." *Id.* at 614, 616, 622–23. On another occasion, a white supervisor told Rembert: "I see you have your black face on today." *Id.* at 614–15, 618–19.

Rembert also recounted several instances when colleagues threatened him with violence: Once, a colleague used a gesture imitating firing a gun at him. Another time, a white supervisor standing with three or four other white employees said to Rembert "there is enough of us to take him down." *Id.* at 620. And at other times, three employees made comments Rembert perceived as threatening, such as: "we all got ugly faces and we in it together," "are you having fun yet?" and "you better pray." *Id.* at 614, 617–19, 620, 622. Rembert testified that the harassment was so frequent that he could not recall every single incident over those nine months. To avoid his harassers, Rembert took to eating lunch in his car or at his workstation. Eventually, he was briefly hospitalized for high blood pressure and received psychotherapy chiefly to deal with the stress of the harassment.

Even when not threatened or harassed, Rembert also remembered being treated differently than white employees. For example, his supervisor excluded him from "shop talks." While the supervisor claimed that Rembert could not join these gatherings because he was a temporary employee, several white temporary employees were included.

In accordance with Swagelok's policies, Rembert complained to his supervisor, Brett Kaiser. Rembert says that he complained to Kaiser 14–17 times but that Kaiser never took any

action in response. For his part, Kaiser claims that Rembert never told him about any racial harassment—if he had, Kaiser would have reported the complaints to Human Resources.

On August 3, 2017, Rembert was convicted of domestic violence, a fourth-degree misdemeanor. *See* Ohio Rev. Code § 2919.25(C), (D)(1)–(2). That same month, and with Kaiser's assistance, Rembert applied for a permanent position at Swagelok. Rembert claims that he told Kaiser about his recent conviction and that Kaiser told him it was "nothing to worry about." R. 61-1, Pg. ID 2607. Kaiser, by contrast, says that Rembert told him about a different domestic-violence conviction from twelve years earlier—not the more recent one.

On August 24, 2017, Swagelok's hiring manager, Josh Montgomery, interviewed Rembert for the position. During the interview, Montgomery explained that Rembert would have to pass a drug test and background check if offered the job. Although Rembert admits that he was "well aware" of this requirement, he did not tell Montgomery about his recent domestic-violence conviction. R. 49-1, Pg. ID 625. On September 21, Swagelok extended an offer to Rembert. The offer letter reiterated that the job was contingent on his passing a drug test and background check.

A third party, HireRight, performs Swagelok's background checks. The background checks look back seven years and flag any criminal convictions. Swagelok has no blanket rule against hiring applicants with criminal convictions; instead, it reviews flagged background checks and makes an individualized hiring decision based on the information that the checks reveal.

Swagelok's recruiting director, John Kocsis, reviewed Rembert's background check. After noticing Rembert's recent conviction for domestic violence, Kocsis recommended revoking Rembert's offer. But the offer was not revoked right away: on October 12, HireRight sent a pre-adverse-action letter to Rembert on Swagelok's behalf, advising him that his offer might be revoked based on the information uncovered in his background check. The letter also notified

Rembert of his right to challenge the report's findings within seven days. If no challenge was raised within that time, the offer would be revoked in an adverse-action letter. Because Rembert did not contest his background check, Swagelok both revoked his offer of permanent employment and ended his temporary employment.

After filing a charge with the EEOC, Rembert sued Swagelok in federal court, alleging retaliation, race discrimination, and a hostile work environment under Title VII, Section 1981, and Ohio law. The district court granted summary judgment to Swagelok on all claims. Rembert timely appealed.[1]

## II.

Rembert has presented sufficient evidence to survive summary judgment on his hostile-work-environment claim.[2] To succeed, Rembert must demonstrate: (1) he belonged to a protected group, (2) he suffered unwelcome harassment, (3) the harassment was race based, (4) the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) Swagelok "knew or should have known" and did nothing. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). He has done so here.

The first element is undisputed. As to the second and third, Rembert testified to multiple instances of unwelcome, race-based harassment: he testified that his colleagues used the N-word repeatedly, that a supervisor made a "black face" reference directed at him, and that one coworker held up a hose pipe tied like a noose and said, "This is what we do here." R. 49-1, Pg. ID 614–

---

[1] While the notice of appeal also references the district court's evidentiary rulings, Rembert does not discuss any of these rulings in his briefs. Therefore, any challenge to these rulings has been forfeited, and we do not address them. *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).

[2] Whether brought under Title VII, Section 1981, or Ohio law, all of Rembert's claims are analyzed under the same framework. *See Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (race-discrimination claims); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) (hostile-work-environment and retaliation claims); *see also Ohio C.R. Comm'n v. David Richard Ingram, D.C. Inc.*, 630 N.E.2d 669, 674 (Ohio 1994).

622. On appeal, Swagelok does not challenge the district court's conclusions that this harassment was both unwelcome and race based, so we focus on the last two elements.

To assess the fourth element—whether this harassment qualifies as severe or pervasive—we evaluate the totality of the circumstances. *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021). In so doing, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Williams*, 643 F.3d at 512 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). This inquiry has objective and subjective components: "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Johnson*, 13 F.4th at 505 (cleaned up). A plaintiff can succeed by showing that the harassment was either severe, pervasive, or both. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (explaining that these terms are "properly considered in the disjunctive").

Here, Rembert has presented sufficient evidence from which a reasonable jury could conclude that the harassment was severe or pervasive enough that a reasonable person would find the work environment hostile. Rembert testified that his supervisors and coworkers used the N-word routinely and that one coworker threatened him with a noose. If a jury were to credit the testimony about the N-word alone, it could reasonably conclude that Rembert was subject to severe or pervasive harassment. *See Johnson*, 13 F.4th at 505 ("Comments and harassing acts of a continual nature are more likely to be deemed pervasive and evidence of an objectively hostile work environment." (cleaned up)). Additionally, a jury could conclude that in light of these

comments, a coworker holding up a noose and telling Rembert "this is what we do here" was a physical threat. *See Williams*, 643 F.3d at 512.

Moreover, Rembert testified to many other instances of harassment—some were obviously race based, and others may have been. Under the required totality-of-the-circumstances analysis, we must be "mindful of the need to review the work environment as a whole," remembering that "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562–63 (6th Cir. 1999); *Johnson*, 13 F.4th at 505 ("The totality of the circumstances, of necessity, includes all incidents of alleged harassment." (cleaned up)). Here, a reasonable jury could conclude that Rembert satisfied the objective component of the severe-or-pervasive analysis.

In addition, Rembert has presented sufficient evidence for a jury to conclude that he "subjectively regard[ed] th[e] environment as abusive." *Johnson*, 13 F.4th at 505 (citation omitted). Rembert testified that he complained about the harassment 14–17 times to his supervisor, that he had to eat lunch in his car to avoid his colleagues' harassment, and that he ultimately had to be treated with psychotherapy to cope with the effects of the harassment. He also testified that he understood the noose incident to be a "major threat." R. 49-1, Pg. ID 616. From this evidence, a reasonable jury could conclude that Rembert "subjectively perceive[d] the environment to be abusive." *Barrett*, 556 F.3d at 514 (quoting *Harris*, 510 U.S. at 21).

On the fifth element, Rembert must also put forward sufficient evidence from which a reasonable jury could conclude that Swagelok "knew or should have known about the harassment and failed to act." *Williams*, 643 F.3d at 511. On this point, Rembert testified that he followed Swagelok's policy and reported the harassment to his supervisor, Kaiser, somewhere between 14–

17 times, and that Kaiser failed to act in response. Kaiser, by contrast, testified that he didn't act because he was not aware of any complaints of racial harassment. This constitutes a genuine issue of material fact for trial: a jury could credit Rembert's testimony and conclude Kaiser knew of the harassment and failed to act.

Thus, we reverse the district court's grant of summary judgment to Swagelok on Rembert's hostile-work-environment claim.

### III.

We next address Rembert's retaliation and race-discrimination claims, which allege that Swagelok unlawfully rescinded his offer and terminated his employment. Because Rembert relies on indirect evidence, we apply the three-step *McDonnell Douglas* burden-shifting framework to both claims. First, Rembert must establish a prima facie case of retaliation and race discrimination. Second, the burden shifts to Swagelok to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions. Third, the burden shifts back to Rembert to show that Swagelok's proffered reason is pretextual. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023); *Smith v. City of Toledo*, 13 F.4th 508, 514–15 (6th Cir. 2021).

Rembert's retaliation claim fails at the first step because he cannot carry his burden to establish a prima facie case of retaliation. And his race-discrimination claim fails at the third step because he cannot carry his burden to establish that Swagelok's legitimate, nondiscriminatory reasons for revoking his hiring offer were pretextual.

### A.

To establish a prima facie retaliation claim, Rembert must show that: (1) he engaged in protected activity under Title VII, (2) Swagelok knew about the protected activity, (3) Swagelok took a "materially adverse" employment-related action against him, and (4) a causal connection

between the protected activity and the adverse action exists. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

Rembert fails to make this showing. Specifically, he does not satisfy the second element— knowledge. It is insufficient to show that someone at Swagelok knew Rembert complained of race-based harassment. Instead, he must show that "the individual[] charged with taking the adverse employment action knew" about those complaints. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). Here, the recruiting director, John Kocsis, made the final decision to rescind Rembert's employment offer. And Rembert does not allege that he made Kocsis aware of the harassment. Instead, Rembert says he complained to his supervisor, Brett Kaiser. Nothing in the record shows that Kaiser communicated this information to Kocsis, and Kocsis himself testified that he did not know Rembert complained of or reported racial harassment.

In sum, Rembert presented no evidence to refute Kocsis's testimony on this point. Instead, he makes three arguments to counter that problem. None succeeds.

First, Rembert argues that Kocsis was not the relevant decisionmaker. But the record shows otherwise. Kocsis testified that he made the decision to rescind Rembert's job offer. Another HR employee, Jennifer Freyhauf, confirmed the same. To cast doubt on this fact, Rembert cites testimony from Caryn Kissane, a contractor who briefly worked in Swagelok's recruiting department, who said that someone other than Kocsis instructed her to rescind Rembert's employment offer. However, Kissane also testified that she did not know who made the final decision to rescind. So her testimony fails to contradict Kocsis's and Freyhauf's—it merely shows that someone other than Kocsis transmitted the order to Kissane. Thus, Rembert presented no evidence to support his theory that someone other than Kocsis was the decisionmaker. *See Smith*,

13 F.4th at 514 ("[T]o show a genuine issue of material fact . . . [t]here must be evidence on which the jury could reasonably find for [Rembert.]").

Second, Rembert speculates that Kocsis knew about the complaints because he had interacted with Kaiser. In support, he relies on one unpublished opinion from our court. *See Hicks v. SSP Am., Inc.*, 490 F. App'x 781 (6th Cir. 2012). But that case is not on point. In *Hicks*, the plaintiff established that the decisionmaker was friends with and had "ongoing interactions" with the coworker who received the plaintiff's complaints. *Id*. at 785. Here, by contrast, Rembert presented no evidence showing a similar relationship between Kocsis and Kaiser. Instead, he relies on a single conversation in which Kaiser informed Kocsis that Rembert worked for him and was applying for the full-time role. But Kocsis couldn't recall the details of that conversation—he did not even recall if the interaction occurred in person or by email. And Kaiser did not remember the interaction at all. Rembert's speculation thus falls far short of "the specific facts required" to demonstrate Kocsis's knowledge based on any interaction with Kaiser. *Mulhall*, 287 F.3d at 552.

Third, Rembert argues that his complaints to Kaiser can be imputed generally to Swagelok. Again, he cites no binding authority supporting that proposition. Indeed, our cases say the opposite: "general corporate knowledge" is insufficient, and the plaintiff must instead show that "the decisionmaker" knew of his protected activity. *Evans v. Pro. Transp., Inc.*, 614 F. App'x 297, 300–01 (6th Cir. 2015) (citing *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007), and *Mulhall*, 287 F.3d at 551). Rembert has not made that showing here.

In sum, Rembert failed to establish the second element of his prima facie case. Thus, his retaliation claim falters at the first step of the *McDonnell Douglas* analysis.

B.

We turn to Rembert's race-discrimination claim. The district court held that Rembert established a prima facie case of race discrimination, but that Swagelok articulated a legitimate, nondiscriminatory reason for its employment decision—namely, Rembert's recent domestic-violence conviction. Neither party challenges these holdings on appeal, so our analysis focuses on one question: did Rembert produce sufficient evidence from which a jury could find that Swagelok's proffered reason was pretextual? The district court said no, and we agree.

Our "ultimate inquiry" is this: "did [Swagelok act] for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). To answer that question and establish pretext, plaintiffs typically establish one of three things: (1) that the employer's proffered reason "had no basis in fact," (2) that the proffered reason "did not actually motivate the employer's action," or (3) that the proffered reason was "insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400. These categories offer plaintiffs "a convenient way of marshaling evidence" to demonstrate that "the employer made up its stated reason." *Tingle*, 692 F.3d at 530. Here, however, Rembert has not produced "sufficient evidence from which a jury could reasonably reject" Swagelok's proffered reason for its actions. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400).

First, Rembert fails to show Swagelok's proffered reason has no basis in fact. Swagelok justifies its actions by pointing to Rembert's recent conviction for domestic violence, and Rembert does not dispute the truth of that conviction. Therefore, no reasonable juror could conclude that Swagelok's rationale has no basis in fact.

Second, Rembert has not shown that Swagelok's proffered reason "did not actually motivate" its actions. *Chen*, 580 F.3d at 400. On this point, Rembert claims "the sheer weight of circumstantial evidence . . . shows Swagelok's explanation is pretext." Appellant Br. 41. He raises numerous arguments, none of which persuades.

To discredit Swagelok's policy purporting to protect workers, Rembert asserts a lack of correlation between criminal convictions and workplace violence. That argument is without adequate support: Rembert relies on one district-court opinion from another circuit which observes only that "no research has shown a link between ex-offenders and workplace violence." *United States v. McKnight*, 33 F. Supp. 3d 577, 586 (D. Md. 2014). The lack of research on this subject does not prove there's "no correlation." Appellant Br. 42. But even assuming that unproven conclusion, Swagelok is entitled to exclude candidates based on criteria it deems relevant, so long as those criteria are not unlawful. Thus, the company is not required to prove its common-sense policy is backed by academic research. What's more, it is hardly suspect for a company to use convictions for violent crime to filter out potentially violent employees. Indeed, the EEOC itself recognizes that 92% of employers subject job candidates to criminal background checks and that employers are not prohibited from rejecting applicants based on prior criminal convictions. *Enforcement Guidance on Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, §§ III(B), V(B)(3) (April 25, 2012).[3]

Next, Rembert argues that Swagelok has inconsistently described its criminal-exclusion policy and failed to consistently identify Kocsis as the relevant decisionmaker. But even if that is

---

[3] Rembert also cites the district court's personal view that Swagelok's policy might not be a good one. However, the district court here appropriately separated its personal opinion from the relevant legal question: whether the policy is lawful.

true, there is no dispute on this record that the policy was applied on a case-by-case basis and that Kocsis was the one who made the decision in Rembert's case.

Rembert also objects to Swagelok's case-by-case review of flagged background checks. Of course, as Rembert concedes, there is nothing inherently suspect about individualized assessments of criminal records. Indeed, EEOC guidance explicitly endorses case-by-case consideration of job applicants' prior criminal convictions. *Id.* at § V(B)(9). This allows the employer to consider the whole person, including rehabilitation efforts and comments of references. *Id.*

Rembert further argues that Swagelok failed to give him the required individualized assessment here, and if it had, it would not have rescinded the offer. He highlights the three factors he claims Swagelok should have considered: "(1) the nature and gravity of the offense; (2) the nature of the job held or sought; and (3) the time passed since the offense, conduct and/or completion of the sentence." Appellant Br. 43 (citing *Green v. Miss. Pac. R.R.*, 523 F.2d 1290, 1298 (8th Cir. 1975) and EEOC guidance adopting *Green* factors). But Kocsis did consider those factors: the basis for his decision was (1) the nature of the offense (domestic violence), (2) that a violent conviction presented "a risk that [a new hire] could become violent in the work environment," and (3) that the conviction was recent. R. 49-4, Pg. ID 864–65, 883. Rembert suggests Kocsis should have done more, like talking to Rembert about the conviction—but the *Green* factors that Rembert endorses do not require that.

Finally, Rembert claims that the hostile work environment he experienced at Swagelok is proof that Swagelok makes its hires on a discriminatory basis. As part of this argument, he highlights that black applicants fail the criminal background check more often than white applicants. This argument has two fatal flaws. First, there is no basis in the record to impute the

actions of Rembert's coworkers and supervisors to Kocsis, who worked in a different department and different building. *See Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 665 (6th Cir. 2013) (whether "discriminatory atmosphere evidence is probative of discrimination" depends on "the actor's position in the employer's hierarchy," among other things (cleaned up)). Second, without that evidence, there is no basis for inferring that the disparate pass rates of black and white applicants are the result of racism in the HR office, as opposed to other, neutral factors.

In short, none of these arguments presents sufficient evidence from which a jury could conclude Swagelok was motivated by something other than its proffered reason.

Third, Rembert can't show Swagelok's proffered reason was "insufficient to motivate" Swagelok's actions. Swagelok aimed to protect its workers from workplace violence, and its policy was written to serve that purpose. Rembert has argued that the policy itself was likely ineffective at preventing workplace violence and that Swagelok hired some white applicants who were convicted of different crimes long before they applied for their positions. Even assuming he is correct, neither of these arguments shows that Swagelok's proffered reason (protecting workers) was insufficient to motivate its actions here (rescinding Rembert's offer and terminating his temporary employment upon discovering his recent conviction). Rembert also argues that his good performance as a temporary employee showed that he was not a danger to his coworkers. But the conviction for domestic violence came *after* Rembert's months of good behavior at work, on the very eve of his application for permanent employment. That gave Kocsis new reason, under Swagelok's policy, to be concerned about Rembert's "risk to [the company's] other associates." R. 49-4, Pg. ID 865.

Rembert also argues here that Swagelok's proffered reason was insufficient because eight white comparator applicants were hired despite criminal convictions. This argument is better

suited to the second method of proving pretext—that Swagelok's proffered reason did not actually motivate its action—but either way, the argument fails because the comparators are not similarly situated. To qualify as similarly situated, the comparator must be the same in all "relevant respects." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019). In every case, we make an "independent determination" of what factors are relevant, and that determination depends on whether certain factors "are meaningful to the particular claim of discrimination presented." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (explaining the necessity of independently determining factors relevant to this inquiry).

Here, because Swagelok's proffered reason is protecting its workers from violent crime, and because its adverse action against Rembert was based on his very recent domestic-violence conviction, two factors are relevant for the comparators: (1) the type of criminal conviction on the proposed comparators' records (*i.e.*, whether the crime was violent or nonviolent), and (2) the amount of time between that conviction and the proposed comparators' application to Swagelok. Neither one of those factors provides cause for concern: they are reasonably relevant and even largely track the *Green* factors Rembert himself endorses.

Rembert was convicted of a domestic-violence offense three weeks before he interviewed for the job. All eight proposed comparators differed in at least one relevant respect: four were convicted of seemingly nonviolent offenses (*e.g.*, disorderly conduct). For the four convicted of violent offenses, Rembert has not established that any of them were convicted mere weeks before they applied to Swagelok. Indeed, there is no evidence any of these applicants were even convicted

in the same year as their applications.  So none of these eight comparators are similarly situated in all relevant respects.

In short, Rembert has not produced sufficient evidence for a jury to conclude that Swagelok acted for any reason other than its proffered one.  Thus, his race-discrimination claim fails at the third step of the *McDonnell Douglas* analysis.

\*       \*       \*

Rembert is entitled to a trial on his hostile-work-environment claim.  But we agree with the district court that Swagelok is entitled to summary judgment on Rembert's retaliation and race-discrimination claims.  For these reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.